Opinion issued August 11, 2010









 








In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00121-CR






ASHLEY ERVIN, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 208th District Court

Harris County, Texas

Trial Court Cause No. 1074292






DISSENTING OPINION

 I respectfully dissent. A jury found appellant, Ashley Ervin, guilty of capital
murder and assessed punishment at life imprisonment without the possibility of
parole. (1) Appellant argues on appeal that her two written statements and oral recorded
statement were custodial statements taken pursuant to a deliberately employed
"question first, warn later" interrogation technique to circumvent her Miranda
protections. She contents that their admission into evidence against her at her trial
violated of the United States and Texas Constitutions and article 38.22 of the Texas
Code of Criminal Procedure and that the errors were harmful. I agree. Therefore, I
would reverse and remand for a new trial.

FACTSA. Background Facts

 On May 26, 2006, when appellant was 17 years old, she, Keithron Fields, and
Dexter Johnson robbed and killed Brady Davis. Fields and Johnson robbed and shot
Davis, and appellant drove them to and from the scene in her car. Davis died at the
scene of the crime from the gunshot wound.

 On June 23, appellant gave police two written statements at police headquarters
describing an extraneous double murder and describing the Davis murder without
being issued Miranda warnings. (2) The next day she gave the police a recorded oral
statement at police headquarters regarding the Davis murder that confirmed the
information provided in her second written statement. Appellant was given a
Miranda warning at the beginning of her recorded oral statement, and she waived her
rights. A warrant for her arrest was issued immediately upon completion of her
recorded statement, and she was arrested and indicted for capital murder. Appellant
moved to suppress all three statements under the Fourth and Fifth Amendments to the
United States Constitution and article 38.22 of the Texas Code of Criminal Procedure.

 B. Suppression Hearing

 Sergeant P. Motard testified at the suppression hearing in this case that the
police originally sought appellant on June 23, 2006 for questioning about locating
Fields based on his involvement in an extraneous matter, the Aparece/Ngo missing
persons' case. The police were part of the Gang Murder Unit of the Houston Police
Department (HPD), which was investigating the disappearance of Maria Aparece and
Huy Ngo on June 20, 2006 and gathering information to develop suspects. (3) They
were aware that appellant and Fields dated and had information that her car might
have been involved in that crime; they had been asked to locate both Fields and
appellant's car and to confirm that appellant owned a black Nissan.

 Officer D. Arnold and other officers went to appellant's home and asked for
Fields. Appellant's mother stated that neither Fields nor appellant was in the home,
but she told the officers that they could find appellant at her work. The officers went
to appellant's work, told her they were doing an investigation, and asked if she would
speak with them, which she did. At the officers' request, appellant walked them to
her car, a black Nissan Sentra. At 5:40 p.m., she signed a consent form to allow the
police to tow and search the vehicle. The officers towed the car for further
investigation.

 Appellant voluntarily agreed to answer more questions and was transported to
police headquarters in the back of a locked and secured patrol car. Sergeant Motard
testified at the suppression hearing that appellant was not handcuffed and that her cell
phone and keys were not taken from her. He testified that the officers had no warrant
for her arrest and did not consider her in custody, that they were just trying to obtain
Fields' location from her and "were hoping she was just simply a witness." He
testified that appellant could have left at any time, but she would have had to have
asked because the patrol car was "a secured vehicle."

 1. First Written Statement

 While at the police station, appellant was interviewed by Sergeant Motard,
who asked her to lay out anything she knew about the Aparece/Ngo matter. Sergeant
Motard testified that appellant was not read her Miranda rights because she was not
considered to be a suspect or in custody. Appellant provided Sergeant Motard with
a detailed account of the events that led to the killing of Aparece and Ngo, placing
herself at the scene of the crime.

 Sergeant Motard asked appellant to memorialize her account as a written
statement, which she did at his workstation. Appellant's statement, signed at 7:05
p.m., indicated that she, Tim Randle, Alvie Butler, Dexter Johnson, and Keithron
Fields were riding in her car before Aparece and Ngo were killed, that they followed
the victims, and that Johnson killed both Aparece and Ngo. Sergeant Motard took the
written statement without giving appellant a Miranda warning. Her statement
included the sentence, "I have been told I am not under arrest." Appellant asked if
she was allowed to go to the bathroom and was permitted to do so; she declined the
offer of something to drink.

 2. Second Written Statement

 Sergeant Motard testified that, after he took appellant's first written statement,
appellant remained unguarded at his workstation. He did not tell her she could go
home. Instead, he told her, "Let me just check with these other guys and see how this
whole thing is--you know, what your information is versus what they're
remembering." Sergeant Motard testified that he left the workstation and met with
Detective A. Brown and the team investigating the killing of Brady Davis, who were
interviewing the male suspects who had been taken into custody. He told them her
statement "sounded pretty good," and he then compared his notes with the
information the other investigators were obtaining from their interviews. (4)


 Sergeant Motard testified that, upon learning of appellant's statement regarding
the Aparece/Ngo case, Detective Brown began to suspect that appellant had
information relevant to the Brady Davis case. He asked Sergeant Motard to question
appellant concerning the Davis killing. Sergeant Motard testified that, until then, he
had no suspicion that appellant was involved in the Davis case, and he characterized
his subsequent questioning of her as a "fishing expedition."

 According to the record, before he started taking appellant's second written
statement at 8:30 p.m., Sergeant Motard testified that he "brought up Brady Davis
because Brown had asked me to. So there was a little brief conversation about that
whole incident. And [appellant] acknowledged that she was aware of circumstances
surrounding his death." Motard then asked appellant to provide a statement
concerning the Davis case, and appellant agreed. In her statement, appellant
implicated herself as the driver in the crime. After appellant provided her statement
about the Davis case orally, she consented to memorialize it as a second written
statement.

 According to appellant's second written statement, in the hours preceding
Davis's death, appellant, Johnson, and Fields had been "out all night." In the early
morning hours, while appellant was asleep in the back seat of her car, Johnson was
driving around without any evident destination. Appellant stated that Johnson
stopped the car and Fields got out and robbed a woman. When Fields returned to the
car, he stated that the woman did not have any money. Following this robbery,
appellant drove her car, and Johnson and Fields were passengers. As she approached
the intersection of Homestead and Hartwick in northeast Houston, Johnson or Fields
saw a man at a carwash. Johnson asked to get out of the car, and he and Fields
approached the carwash. Appellant left, then heard a gunshot and returned to the
carwash. She picked up Johnson and Fields, who entered her car carrying their
"black bandana masks," and then she drove them to Fields' home.

 Sergeant Motard testified that he developed the belief that appellant was
possibly culpable for the killing of Davis during his questioning of appellant
regarding that case, but he never gave her Miranda warnings. Motard also testified
that while he was questioning appellant that day he offered her food and drink and
told her that she was not under arrest. She did not call her mother. After she had
given her second written statement, Sergeant Motard spoke with Officer
Abbondondalo, who had taken the statement of Johnson, who was in custody in the
same office. Motard then asked appellant if she would like to speak with Johnson,
which she did. Shortly after she gave her second statement, Sergeant Motard,
Detective Brown, and Officer Abbondondalo took appellant home, between 10:00
and 11:00 p.m.

 Appellant's mother testified that she tried to contact appellant on her cell phone
but did not get any kind of response.

 Appellant testified that when the police came to her place of work they asked
if she had a black Nissan Sentra. When she said she did, they asked to see her car and
she took them to it. She signed the consent-to-search form they gave her because the
officers told her "it was for them to bring my car downtown because I wasn't allowed
to drive it myself." She did not believe that she could leave the patrol car or that she
was free to go, and the police did not tell her that she was. They asked her to go to
police headquarters, and she went with them because she "felt like I had to go with
them because they told me to." They took her to an interview room at the police
station. She did not believe she could leave, and the police did not tell her she could. 
The police took her cell phone and did not give her an opportunity to call her mother
or anyone else. The officer told her that if she cooperated and signed the statement
she could go home, but she was not allowed to go home. Appellant did not believe
that she was under arrest, "but I did believe I had to do what they asked me to," and
she did believe she was in their custody and was not free to go home. She signed her
first written statement affirming, "I have been told that I am not under arrest. I
willingly signed a consent to search for officers to search my black Nissan."

 Appellant testified that after she signed the first written statement she stayed
in the interview room, and the officer would ask her questions and then leave and
come back and ask more questions. On one of these occasions, he left the room and
came back and said someone had informed him that she was the driver in the Brady
Davis case. At first only Sergeant Motard questioned her about the Davis case, but
just before she gave the second statement he was joined by a second officer who
asked her if she was the driver. Her mental state during the second statement was the
same as during the first: she was scared and believed she had to do what the officers
wanted her to do. She told the officers she was the driver during the Davis murder
when she gave the second statement.

 3. Third Recorded Oral Statement

 Sergeant Motard testified that the next day, June 24, he, Officer Abbondondalo,
and Detective Brown met to compare notes on what everybody had said about the
Aparece/Ngo murders and the Davis murder. Appellant's statements had contradicted
the statements of suspects Alvie Butler, Timothy Randle, and Dexter Johnson by
failing to place her brother, Louis Ervin, at the Aparece/Ngo murder scene. Sergeant
Motard, Officer Abbondondalo, and Detective Brown returned to appellant's home
about 12:45 p.m. and asked her to return to the police station with them to "rehash"
her previous statements about the Aparece/Ngo and Davis murders and to resolve
some discrepancies. Appellant was still in her pajamas. She returned to police
headquarters with them in their Ford Taurus.

 Sergeant Motard further testified that he took the interview and recorded it. He
began by reading appellant her Miranda rights. Appellant waived her rights and gave
the statement. After questioning, which concluded at 1:44 p.m., appellant was taken
to the unsecured "family room," where the officers told her that her family was
waiting. Sergeant Motard testified that appellant's brother Louis had been brought
in for questioning, and appellant was asked to wait pending an "opinion on all this"
from the District Attorney's Office. Sergeant Motard testified that appellant remained
unguarded while she waited and was free to leave at any time. The police placed
appellant in custody after they were told that Officer T. Miller had obtained a
probable cause warrant against appellant. Sergeant Motard walked her back to his
office, where she had made her statements the day before, filled out paperwork, and
called the patrol unit. When it came, appellant was handcuffed for the first time and
taken to jail.

 4. Trial Court's Denial of Motion and Findings

 Appellant's counsel argued that all three of appellant's statements were
custodial statements for which she was not given Miranda warnings and that the third
oral recorded statement was "potentially fruit of the poisonous tree because Sergeant
Motard had indicated that a lot of the information that he asked about on the oral
statement was what he had gathered from the statement on the day before." At the
close of the suppression hearing, the trial court denied appellant's motion to suppress. 
The court made specific findings that appellant was not in custody when she gave her
first two written statements and that, although she was in custody when she gave her
taped oral statement, the statement met the requirements for admissibility. The court
also found that the two written statements were not custodial statements and that,
therefore, "there would be no fruit of any poisonous tree."

 On appeal, appellant's counsel filed a motion to supplement the record with
written findings of fact by the trial court. This Court granted the motion and the trial
court provided findings of fact. The trial court found that appellant's first two
statements were non-custodial; it found that the third statement was custodial and that
appellant had been informed of her rights under article 38.22 of the Code of Criminal
Procedure and Miranda, and that she knowingly, intelligently, and voluntarily gave
up those rights. The trial court further found that the police officers did not suspect
appellant in either the Aparece/Ngo case or the Brady Davis case when they
questioned her and that appellant gave her statements knowingly, intelligently, and
voluntarily. The trial court's findings also indicated that although appellant was not
able to open the doors of the police vehicle in which she was transported she was
informed that she was not obligated to speak with the officers and that she could
leave at any time. The trial court's findings also indicated that appellant "remained
at the station from approximately 6:00 p.m. until approximately 10:00 p.m." on the
day she provided her first two statements. The trial court found Sergeant Motard and
Officer Arnold to be credible witnesses and appellant to be a non-credible witness.

C. Trial

 At trial, the State offered both redacted and non-redacted versions of
appellant's first written statement. Appellant objected to the admission of both as
being in violation of the Fourth and Fifth Amendments to the United States
Constitution and applicable sections of the Texas Constitution, as well as articles
38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure. The court admitted
the redacted version of her first written statement with references to the Aparece/Ngo
murders omitted. The court overruled appellant's objection to the admission of the
redacted first written statement but gave her a running objection. The State then
tendered appellant's second written statement. Appellant repeated her objections
under the Fourth and Fifth Amendments to the United States Constitution, the Texas
Constitution, and articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal
Procedure. The court overruled the objections and gave appellant a running
objection. The court then permitted the State to read the two admitted written
statements into the record verbatim.

 The redacted version of appellant's first, un-Mirandized written statement,
signed at 7:05 p.m. on June 23, as read into the record, stated that appellant had
consented to the search of her black Nissan, that she had known Dexter Johnson since
she was a child, and that Keithron Fields was her boyfriend. Appellant's second un-Mirandized written statement, given on the evening of June 23 at 8:31 p.m., contained
a complete description of all the events in which appellant had participated on the
evening of Davis's murder.

 The statement provided that, about three weeks before the date of her
statement, appellant, Dexter Johnson, and Keithron Fields had been out all night. 
Dexter was driving her car, and Keithron was in the front seat. Appellant fell asleep
on the back seat while they were driving around. She woke up when she heard the
door slam. Keithron was getting back in the car with his jacket on with the hood up. 
He told Dexter that "the woman didn't have any money, but he did have her wallet." 
They threw the wallet away and drove off, "looking for someone to get money from." 
There was no one to get money from, so Dexter stopped and let appellant drive.

 When appellant stopped at a light they saw a carwash on the corner with a man
washing a large truck. Dexter asked appellant to let Keithron and him out there. She
did, knowing "they were going to rob someone in the carwash." She drove around
for two or three minutes, during which time she heard one loud gunshot from the
carwash. She returned and picked up Dexter and Keithron, who were standing in the
street with their hoods up and holding their black bandana masks. They were out of
breath, as if they had been running. They got into the car, and they all returned to
Keithron's house, where "Dexter turned the TV news on to see what they were
showing." In her statement, appellant said that Dexter told her, "'The man elbowed
me like he was going take off and run.' He said, 'That is why I had to shoot him.'" 
The same day Keithron told her the same thing. They were both only a little nervous. 
They did not get any money either from the lady at the bus stop or from the man at
the carwash. She knew they both had guns.

 The statement also said that, on the weekend of June 10, 2006, appellant let
Keithron borrow her car. He took her to work and later called her to say that he was
in her "home area hanging with a group of guys when the police showed up." They
asked permission to look in the car, and Keithron told them it was okay. Because he
and Dexter knew the police would find marijuana, they "took off running." The
police towed her car, searched it, found the drugs and found one gun, "but they did
not find the .380 that under the back seat." When she got the car back, Dexter asked
for the gun, and she sent it back to him.

 The statement ended with appellant's statement that she had been informed that
under section 37.02 of the Texas Penal Code a person commits the offense of perjury
"if with the intent to deceive and with knowledge of the statement's meaning, he or
she makes a false statement under oath or swears to the truth of a false statement
previously made and the statement is required or authorized by law to be made under
oath." The statement did not contain a statement that appellant had been warned of
her Miranda rights.

 Sergeant Motard testified that, after appellant signed the second written
statement, he allowed her to walk down the hall and talk with Dexter Johnson, who
was in custody. When asked about her mental state, he testified that "[s]he had gotten
emotional even before she went down there and was teared up and that kind of thing." 
After she met with Johnson, and "once [Officer] Abbondondalo finished with Dexter
Johnson," Sergeant Motard and Officer Abbondondalo drove appellant home.

 Sergeant Motard further testified that the next day the officers went looking for
Keithron Fields, and they went to locate appellant and "speak with her again about
her statement the previous night" in order to clear up "some discrepancies between
her statement and the other statements that were made." Sergeant Motard, Officer
Abbondondalo, and Detective Brown took her downtown in their car to police
headquarters, where Sergeant Motard read her her Miranda rights and recorded the
interview. After she gave her recorded statement, Sergeant Motard asked her to wait
while the investigators "ran this whole thing by the DA's office." When he was
advised that the police had obtained a warrant for appellant's arrest, Sergeant Motard
informed her family that appellant had to "stay with us." He went to his cubicle and
filled out the paperwork and "called the unit to come and they did."

 The State also offered the Mirandized recorded interview into evidence at the
trial. Appellant objected on the basis of "the fruit of the poison tree, that this was
produced from the written statement that was given before" and on the basis of "all
the same reasons" that had been previously given. The trial court overruled the
objection and gave appellant a running objection to the recording. After the State had
confirmed with Sergeant Motard that he had read appellant her Miranda rights before
taking the recorded statement, the State played the recording to the jury.

 Sergeant Motard testified on cross-examination that when appellant was
brought in for questioning on June 23, he did not know whether appellant had her cell
phone, but he did not tell her she could use the telephone. He also testified that, prior
to taking her first written statement, at 7:05 p.m. on June 23, he would leave her
presence for periods of time to see whether "her version of events comported with the
version of events that the other guys were [telling]." He did not consider her a
suspect, although, "I felt that she could be criminally culpable." He did not get any
"specific information" indicating that she was the driver on the Davis case until she
told him "while we were working on the second statement." He thought appellant
was "possibly culpable," but he did not read her her Miranda rights at that time.

 Sergeant Motard further testified that the second written statement, begun at
8:31 p.m. on June 23, "almost resembles the taped part." However, when appellant's
counsel pointed out that "on the tape I noticed that she would give you a narrative and
then you would then give additional information and ask her if it was true or correct,"
Sergeant Motard testified,

 Well, in that particular instance she's--I'm already working off the
second statement. All I'm doing really in that second statement on the
tape was confirming what she said in her first, in her typed written
statement because there was--as we pointed out earlier, there was a
discrepancy already in the first statement she gave, State's 7.


State's exhibit 7 was appellant's first written statement, containing her description of
the Aparece/Ngo murders, which was not admitted.

 Sergeant Motard further testified that when he read appellant her Miranda
rights at the beginning of her recorded oral statement on June 24, he had the same
feeling with respect to appellant's "possible culpability" he had had the day after her
second written statement and during that statement when he determined that she had
at some point driven the car at the Davis killing. He also testified that when he took
appellant's recorded statement on June 24 he would listen to her for a while and then
would paraphrase and add some additional information ascertained during the course
of the investigation. The recorded statement was "a little different in that, as I said,
all I was doing was just trying to clarify was this accurate; was the statement she gave
me about Brady Davis, was that accurate from the day before." His impression was
that Davis "was a target of opportunity," that Johnson saw it, and that he directed
appellant over to it.

 In addition to Sergeant Motard's testimony, the jury heard the testimony of
Reginald Pettis, who lived next door to the carwash. He testified that he was in bed
sleeping around 6:15 or 6:30 a.m. on May 26 when he heard a gunshot and looked out
the window and saw Brady Davis's truck. He did not see anyone leaving the location. 
When the truck did not move after 10 to 15 minutes, he got dressed and walked to the
carwash, where he found Davis lying partially under the truck. Davis was still alive,
bleeding from the lower part of his body, with his eyes closed. Pettis told him help
was on the way and called 911. A middle-aged man he did not know came up and
returned with the victim's wife and son.

 Carl Herbert testified that he lived about three blocks from the carwash. 
Herbert got up about 5:30 a.m. on May 26. He knew Davis because he worked with
him at North Forest Independent School District. While he was outside warming up
his truck to go get coffee at the Shell station as he did every morning, Davis stopped
by and mentioned he was going to the carwash to wash out his barbeque pit, which
was in the truck. Herbert told Davis he was going to the Shell station to get coffee. 
When he left to get coffee, he saw Davis at the carwash and spoke to him. When he
returned, about fifteen minutes later, Davis was lying on the ground. Herbert blew
his horn, but Davis did not answer. He got out of the truck and touched him, and
Davis opened his eyes and smiled and turned around, and Herbert saw he had been
shot. Herbert told him he was going to get Davis's wife and return. When he got
back with Davis's wife and son, the ambulance was there and Davis was dead. He
did not see anybody else there when he first got to the carwash.

 Officer D. Nunez, a crime investigator for HPD, testified that he arrived at the
scene a little after 7:00 a.m. and met with the patrol officer who had been first to
arrive. They identified the evidence, did a scene video, and took photographs, to
which he testified. He processed a beer can at the scene but found no fingerprints. 
He found blood stain evidence indicating the deceased had been standing by the front
right passenger door when he was shot. The bullet that entered Davis's body was
recovered at the scene. He did not process the vehicle in order not to interfere with
processing at the vehicle exam building. Davis's wallet and money were found in his
pockets. Officer Nunez had no personal knowledge of the actual shooting.

 Mary Frances Crutcher testified that she went out of her house on Raincove 
on the morning of May 26, 2006 about 5:20 a.m. She did not have to work that day,
but she wanted to take some brownies to the bus driver on the 5:30 bus because it was
his last day on the route. The bus would come up Homestead and turn on Hartwick. 
The bus stop was in the middle of the block on Hartwick between Raincove and
Homestead. It was dark out. She stepped into the bus and the driver drove slowly up
to her street with the door open as they talked. She saw a young girl walking toward
them like she was trying to catch the bus, which is why she thought the driver had the
door open, but the girl kept walking down the street. She had a backpack on, and
Crutcher thought she was a high school kid. Crutcher thought it was strange that at
that time of morning the girl would pass the bus by, but she thought maybe somebody
was going to pick her up. She did not see anyone behind her.

 After the bus driver dropped her off about a house away from her house, but
when she was still talking to him, Crutcher noticed someone coming up toward the
bus. She thought he had gotten on, but he had passed in front. She then heard him
yell, "Hey you," and thought maybe he wanted to know what time the next bus came. 
She turned and saw a dark figure at the corner. He was dressed all in black, and was
very tall. He had on a black cap, a black jacket with a hood, and a black bandanna
over his face, and he had big hands. She kept walking. He got closer and started
circling in front of her, cursing and demanding money, but she told him she did not
have any, that she was in her pajamas and only had her keys. He was standing under
a streetlight, and she could see he had a small silver automatic pistol. He then
demanded her jewelry. She did not remember she had her cross on until he reached
for it, when she was about seven feet away. She said "no" and backed away. He
reached again; and she backed away and said "no" again; and he turned and ran. She
went in the house and called the police.

 Later, Crutcher and her sister heard helicopters overhead, and she thought
maybe the man who had accosted her had tried to rob somebody and they had caught
him, so she went up to the carwash. There the police overheard her say, "I bet you
it's the same guy that tried to rob me." They asked her to talk to homicide, and she
did. Crutcher did not see the girl again. She did not see the robber get in any kind
of car and did not see any cars on her street or on the street he turned onto.

 Detective Brown testified that he was called to the scene of the Davis crime
around 6:37 a.m. He talked to Pettis and Crutcher. He thought the attempted robbery
of Crutcher was related to the Davis murder because of her description of the suspect,
the weapon, the close proximity--two long city blocks away, the first street up and
down one block--and the time. Crutcher told the officers the weapon was a small
automatic that she thought to be a .380, and they recovered a .380 shell casing from
the Davis crime scene. At first they did not have any leads, but on June 23, a
statement was taken by Sergeant Motard from appellant that gave them their first
significant lead. After that statement, he had the names of three people he believed
to have been involved in the capital murder of Davis--appellant, Fields, and Johnson.

 On cross-examination, Brown testified that, about three o'clock on the day of
the crime, he received a phone call from the office transferring a woman who would
not identify herself. The woman stated that she had heard a shot and had looked out
of her window and seen two black males running from the direction of the carwash,
looking back and waving. At that point, a black four-door that looked like a Nissan
Sentra pulled up with someone else driving and picked up the two men and left the
area. He did not get her telephone number and could not locate her afterwards. She
said one of the men was tall and slender, and the other was considerably shorter and
might be a little bit stockier, but they had hooded coats on so it was hard to tell.

 J. Schraub, a latent print examiner with HPD, testified that among print cards
from the black Nissan Sentra there were matches with Fields. Neither of the two print
cards from the crime scene matched any of the suspects.

 D. Stein, a firearms examiner with HPD, testified that a fired .380 auto
cartridge case and a fired bullet were recovered from the crime scene.

 Officer D. Arnold testified that, on June 23, he was among the officers who
checked locations looking for Fields and who located appellant and asked to inspect
her car. Since appellant agreed to be interviewed, "we needed to get her to the
office. . . . So in order to be expeditious, I had a unit stop by and pick her up and
drive her to 1200 Travis." He remained at her workplace to finish up, since the car
needed to be transported by a city wrecker so it could be gone over by the HPD crime
scene investigator. The officers took appellant's car keys so the car could be towed. 
He did not recall whether anyone took her cell phone. They did not tell her why they
wanted to search the car.

 The jury charge allowed appellant to be convicted as a principal, under the law
of parties, or as a participant in a conspiracy that resulted in the death of Brady Davis. 
The jury convicted appellant of capital murder, and the trial court sentenced her to life
in prison without the possibility of parole.

ADMISSIBILITY OF APPELLANT'S STATEMENTS

 Appellant contends in her first three issues that the trial court erred in failing
to suppress her two written statements and her recorded oral statement and in
admitting each of them into evidence. Appellant contends that neither her two written
statements nor her recorded oral statement should have been admitted against her at
trial because they were all the product of an "unlawful and prolonged" custodial
interrogation that violated her rights under Miranda v. Arizona, 384 U.S. 436, 86 S.
Ct. 1602 (1966), and the Texas confession statute, article 38.22, section 2(a), of the
Texas Code of Criminal Procedure. Specifically, (1) appellant contends in her first
two issues that the trial court erred in finding that her two written statements were not
coerced or the products of an unlawful custodial interrogation and were voluntary,
and (2) she contends in her third issue that the trial court erred in admitting her oral
statement, as it was a continuation of the previous interrogation, and the police
officers' "'question-first-warn-later' procedures" circumvented Miranda, so that her
"mid-stream" Miranda warnings at the beginning of her oral statement were
meaningless under Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004),
Martinez v. State, 272 S.W.3d 615 (Tex. Crim. App. 2008), and Jones v. State, 119
S.W.3d 766 (Tex. Crim. App. 2003). The State contends appellant was not in custody
when she gave any of her statements and that she waived her objection to "mid-stream" interrogation, the subject of her third issue. 

A. Standard of Review of Motion to Supress

 Individuals subjected to custodial police questioning in Texas are protected by
the United States' Supreme Court decision in Miranda v. Arizona, 384 U.S. 436, S.
Ct. 1602 (1966), and by article 38.22 of the Texas Code of Criminal Procedure. 
Herrera, 241 S.W.3d at 526 (stating that both article 38.22 and Miranda apply when
persons are in custody and being interrogated). The determination of custody is the
same for both Miranda and article 38.22. Id.

 In Miranda, the Supreme Court held that "when an individual is taken into
custody . . . and is subjected to questioning, the privilege against self-incrimination
is jeopardized." 384 U.S. at 478, 86 S. Ct. at 1630. Consequently, such questioning
requires that the person be informed of his right to remain silent and his right to an
attorney. Id. at 479, 86 S. Ct. at 1630. After the Miranda warnings have been given,
a person may then knowingly and voluntarily waive his rights. Id. "But unless and
until such warnings and waiver are demonstrated by the prosecution at trial, no
evidence obtained as a result of interrogation can be used against him." Id. Evidence
obtained as a result of a custodial interrogation without such warnings and waiver is
inadmissible under the Fifth Amendment. See id. at 494, 86 S. Ct. at 1638. It is also
inadmissible under article 38.22, section 2 of the Texas Code of Criminal Procedure. 
See Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005). (5) An accused who is held
in custody must be given Miranda warnings prior to questioning or the State is
generally "required to forfeit the use of any statement obtained during that
interrogation during its case-in-chief." Martinez, 272 S.W.3d at 619 n.10 (citing
Miranda, 384 U.S. at 444, 86 S. Ct. at 1612). If an accused provides a non-custodial
statement, however, the trial court may admit that statement into evidence if it was
given freely, voluntarily, and without compulsion. Tex. Code Crim. Proc. Ann. art.
38.22, § 5 (Vernon 2005). 

 A trial court's decision to admit or deny evidence of a confession will be
overturned on appeal only when an abuse of discretion is shown. Swain v. State, 181
S.W.3d 359, 365 (Tex. Crim. App. 2005). In reviewing a trial court's decision on the
admission of a confession, we do not engage in our own factual review, and we give
almost total deference to the trial court's determination of historical facts while
reviewing the trial court's application of law de novo. Johnson v. State, 68 S.W.3d
644, 652-53 (Tex. Crim. App. 2002); Carmouche v. State, 10 S.W.3d 323, 327 (Tex.
Crim. App. 2000). The trial court, as the sole trier of fact, evaluates the credibility
of the witnesses and determines the weight to be given to their testimony. Wiede v.
State, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). Appellate courts give almost
total deference to a trial court's custody determination when the questions turn on an
evaluation of credibility and demeanor. Herrera v. State, 241 S.W.3d 520, 526-27
(Tex. Crim. App. 2007). Here, however, appellant has alleged that the police
deliberately used a two-step interrogation technique of "question first, warn later,"
in a calculated way to undermine the Miranda warning. See Carter v. State, 309
S.W.3d 31, 36 (Tex. Crim. App. 2010); see also Martinez, 272 S.W.3d at 623
(quoting Seibert, 542 U.S. at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring)).

 The Texas Court of Criminal Appeals has recently expressly adopted Justice
Kennedy's concurrence in Missouri v. Seibert for the analysis of deliberate two-step
interrogations. Carter, 309 S.W.3d at 38; see Seibert, 542 U.S. at 622, 124 S. Ct. at
2616 (Kennedy, J., concurring). However, Justice Kennedy's Seibert concurrence
provided no guidelines for conducting or reviewing a Seibert-deliberateness
determination. See Carter, 309 S.W.3d at 38. Therefore, the Texas Court of Criminal
Appeals, following the trend in the federal circuit courts of appeals, has adopted the
clear error standard of review in making such a determination. Id. at 39-40. Under
this standard "the question is whether the evidence shows that [the interrogating
officer] deliberately employed a two-step 'question-first, warn later' interrogation
technique to circumvent [the] appellant's Miranda protections." Id. at 38.

 Because "the 'question of whether the interrogating officer deliberately
withheld Miranda warnings will invariably turn on the credibility of the officer's
testimony in light of the totality of the circumstances surrounding the
interrogation . . . [the officer's credibility] is a factual finding entitled to deference on
appeal' and reviewed only for clear error." Id. at 39. Thus, "the accused's Miranda
rights protections turn on whether the trial court finds an arresting officer's
questioning prior to the advisement of Miranda rights was inadvertent or intended to
acquire an advantage in the interrogation process." Id. Thus, specific factual finding
by the trial court regarding the officer's credibility is of great assistance to the
reviewing court. Id. 

 The Court of Criminal Appeals held in Carter:

 [T]he standard of review of a trial court's finding of intent "shall not be
set aside unless clearly erroneous, and due regard shall be given to the
opportunity of the trial court to judge the credibility of the witnesses."
Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504,
1512 (1985). Factual findings concerning intent or deliberateness
should not be disturbed by an appellate court absent contradicting
extrinsic evidence or internal inconsistencies that render testimony
"implausible on its face." Id. This standard is similar to our "great
deference" standard of review for all factual findings, including intent,
if such findings are supported by the record. See Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997) (appellate courts should afford
almost total deference if the resolution of an ultimate question turns on
an evaluation of credibility and demeanor).


Id. (emphasis added). The court observed, "[T]he trial court is the 'sole and exclusive
trier of fact and judge of the credibility of the witnesses,'" particularly when a motion
to suppress is based on the voluntariness of a confession. Id. at 41-42. Therefore,
the appellate courts "must give great deference 'to the trial judge's decision to admit
or exclude such evidence, which will be overturned on appeal only where a flagrant
abuse of discretion is shown.'" Id. at 42 (citing Delao v. State, 235 S.W.3d 235, 238
(Tex. Crim. App. 2007)). 

B. Appellant's First and Second Written Statements

 In her first and second issues, appellant contends her first and second written
statements were custodial statements given without the protection of adequate
Miranda warnings.

 In Texas, determinations of whether an adult is in custody are made by asking
whether a reasonable person in the same circumstance would "believe that his
freedom of movement was restrained to the degree associated with formal arrest." 
Dowthitt v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing Stansbury v.
California, 511 U.S. 318, 325, 114 S. Ct. 1526, 1530 (1994)). At trial, the appellant
has the initial burden of establishing that he is "in custody" for Miranda purposes. 
Herrera, 241 S.W.3d at 526, 532. A determination of custody requires a court to
examine all of the objective circumstances surrounding the questioning and to
determine whether in those circumstances a reasonable person would have felt that
he or she was not at liberty to terminate the interrogation and leave. Dowthitt, 931
S.W.2d at 254-55. Ultimately, "the determination of custody must be made on an ad
hoc basis, after considering all of the (objective) circumstances." Id. at 255 (citing
Shiflet v. State, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985)). 

 Prior to Stansbury, the Texas Court of Criminal Appeals recognized four
factors as relevant to determining custody: (1) probable cause to arrest; (2) the
subjective intent of the police; (3) the focus of the investigation; and (4) the
subjective belief of the defendant. Dowthitt, 931 S.W.2d at 254. After Stansbury, it
held that factors (2) and (4), the subjective intent of law enforcement officials and the
subjective belief of the defendant, are irrelevant unless that intent is somehow
communicated or otherwise manifested to the suspect. Id.; see Stansbury, 511 U.S.
at 3222, 114 S. Ct. at 1530; Dancy v. State, 728 S.W.2d 772, 778 (Tex. Crim. App.
1987). 

 In Dowthitt, the Court of Criminal Appeals provided four sets of circumstances
in which an interrogation may be considered custodial: 

(1) when the suspect is physically deprived of his freedom of action in
any significant way; (2) when a law enforcement officer tells the suspect
that he cannot leave; (3) when law enforcement officers create a
situation that would lead a reasonable person to believe that his freedom
of movement has been significantly restricted; and (4) when there is
probable cause to arrest and law enforcement officers do not tell the
suspect he is free to leave.


931 S.W.2d at 255. The fourth circumstance also requires that the officer's
knowledge of probable cause be communicated to the suspect and that the
"manifestation of probable cause, combined with other circumstances, would lead a
reasonable person to believe that he is under restraint to the degree associated with
an arrest" for custody to be established. Id. 

 Appellant contends that she was in custody when she made her first statement
because she was physically deprived of her freedom of action when police officers
created a situation that led her to believe her freedom of movement had been
restricted. Specifically, appellant contends that the warrantless seizure of her car, the
seizure of her keys and cell phone, her young age and inexperience, her transportation
to police headquarters in a locked patrol car, and the incriminating statements she
made created a totality of circumstances that made her statements custodial for
Miranda purposes. See id. at 255.

 The Texas Court of Criminal Appeals has considered cases like this twice in
recent years. In Dowthitt, the appellant went to the sheriff's office to give a written
statement about a double murder in which only appellant's son, and not appellant
himself, was a suspect. 931 S.W.2d at 252. No Miranda warnings were given. Id. 
Appellant finished, signed the statement, left for lunch, and then returned and asked
to change his statement because it contained a false alibi. Id. At this point, the
appellant was interviewed over a five hour period until 6:00 p.m., when his second
statement was signed, also without Miranda warnings. Id. Because of
inconsistencies between his two statements, the appellant was asked to take a
polygraph test, which he did, finishing about 11:00 p.m. Id. The polygraph test was
recorded on videotape. Id. When the polygraph was finished, the polygraph operator
told the appellant that he had not told the complete truth about everything, and he
brought the detective back in. Id. The appellant was then intensively questioned on
videotape for two more hours until he wrote and signed a statement placing himself
at the scene of the crime. Id. at 252-54. The appellant was then taken to the
detective's office to work on his third written statement, which was signed at 3:55
a.m. Id. at 254. No Miranda warnings were given until the statement was completely
written, but appellant was given his Miranda warnings three times before he signed
the third statement. Id.

 The Court of Criminal Appeals held that the appellant was not a suspect when
he came voluntarily to the police station, but he became one as the interview
progressed. Id. at 256. While the appellant had been told that he was not a suspect
at 7:00 p.m., the court held that it was apparent that he had become a suspect by 1:00
a.m., at the beginning of the polygraph examination. Id. When he was told around
1:30 a.m. that he was not going to be permitted to leave, "This express assertion itself
amounted to an arrest." Id. However, even though the appellant never expressed a
desire to leave and was not told he could not leave until 1:30 a.m., he was in custody
from the time he admitted he was present during the murder, around 1:00 a.m.,
because, after this admission, "the police had probable cause to arrest." Id. The
"crucial admission" that the appellant was present during the crime turned the non-custodial encounter into a custodial one. Id. The court stated:

 While appellant did not admit to committing the offenses, his admission
that he was present during the murders was incriminating, and a
reasonable person would have realized the incriminating nature of the
admission. Given the length of the interrogation, the existence of
factors involving the exercise of police control over appellant
(accompanying appellant at restroom breaks, ignoring requests to see his
wife), and appellant's damaging admission establishing probable cause
to arrest, we believe that "custody" began after appellant admitted to
his presence during the murders.

Id. at 257 (emphasis added).


 Under similar circumstances in Jones v. State, the Texas Court of Criminal
Appeals held that the appellant was "clearly in custody" for purposes of Miranda. 
119 S.W.3d 766, 771-72, 776 (Tex. Crim. App. 2003). The defendant in that case
was under arrest and incarcerated for outstanding traffic warrants and for possession
of a controlled substance when he was interviewed. Id. at 771. While incarcerated,
he had given two statements implicating himself in a murder and had received
Miranda warnings for both. Id. Nine or ten days later, he was questioned while in
jail about two extraneous murders on the basis of information obtained by
investigators. Id. He was not given Miranda warnings before being confronted with
the statements of his "good friend, Ricky 'Red' Roosa," and told that Roosa had
named him as "primarily responsible for the murders." Id. The Court of Criminal
Appeals stated:

 At that point, appellant orally admitted his involvement in the two
murders. As appellant confessed and described details of the offense,
[Texas Ranger A.] Akin wrote down "verbatim" what appellant said on
a statement form, asking questions and transcribing the answers as they
went along. The entire interview lasted about an hour-and-a-half. When
appellant finished his story, Akin got up, sat down next to appellant, and
went over the legal rights that appeared at the top of the written form. 
Then Akin and appellant read the statement together and appellant
corrected mistakes, initialed revisions, and signed the statement at the
bottom.


Jones, 119 S.W.3d at 771-72. 

 The Court of Criminal Appeals contrasted the circumstances in Jones with the
controlling United States Supreme Court case on the admissibility of unwarned
statements, Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285, (1985), in which the
defendant was held not to be in custody when he gave an incriminating statement. 
The Court of Criminal Appeals observed, 

 [T]he unwarned and warned statements in this case were given during
a nearly undifferentiated single event, taking place in the same room as
an uninterrupted and continuous process. The written Akin statement
was literally a transcription of appellant's unwarned oral statements. 
Appellant did not make a second statement after he finally received his
Miranda warnings; he simply signed the written statement that he had
dictated to Akin before he was warned.


119 S.W.3d at 775. The court stated:

 Appellant was incarcerated in the Tarrant County Jail under suspicion
for capital murder when he was transported to another part of the jail in
the early hours of the morning to meet Ranger Akin and another officer. 
He was taken to a small (approximately 8' x 12') interview room to meet
with two officers who informed him that they were investigating the
Sanders and Peoples murders. After five or ten minutes, Akin asked
appellant what he would think if "they" had been told by appellant's
good friend "Red" that appellant had the "primary responsibility" and
was the "bad guy" in the two murders. This was a classic police
"interrogation" environment. Under these circumstances, appellant
was clearly in custody for purposes of Miranda when he gave the Akin
statement.


Id. at 776 (emphasis added).

 The trial court expressly found, following the hearing on appellant's motion
to suppress, that appellant's first two written statements were non-custodial. It further
found that the police officers did not suspect appellant in either the Aparece/Ngo case
or the Brady Davis case when they questioned her and that appellant gave her
statements knowingly, intelligently, and voluntarily. The court found that although
appellant was not able to open the doors of the police vehicle in which she was
transported, she was informed that she was not obligated to speak with the officers
and that she could leave at any time. It also found that appellant "remained at the
station from approximately 6:00 p.m. until approximately 10:00 p.m." on the day she
provided her first two statements. Finally, the trial court found Sergeant Motard and
Officer Arnold to be credible witnesses and appellant to be a non-credible witness.

 All of these findings went to the issues of custody and the officers' intent,
hence to the voluntariness, and therefore the admissibility, of appellant's statements. 
Thus, I would review the trial court's findings under the clear error standard set out
in Carter to determine whether "contradicting extrinsic evidence or internal
inconsistencies . . . render [the] testimony" going to the issues of custody and the
officers' intent, on which the trial court's credibility findings were based,
"'implausible on its face,'" and, therefore, whether the trial court "clearly erred" in
finding the officers' testimony credible and appellant's contradictory testimony not
credible. See Carter, 309 S.W.3d at 38 n.39, 39.

 Sergeant Motard testified at the suppression hearing that police originally
sought appellant on June 23 for questioning about Fields' involvement in the
Aparece/Ngo crime because they knew Fields and appellant dated, they had
information that her car might have been involved in that crime, and they had been
asked to confirm that she owned a black Nissan. He further testified that appellant
was not handcuffed, that her cell phone and keys were not taken from her, and that
the officers did not consider her in custody but were just trying to locate Fields and
"were hoping that she was just simply a witness." The trial court found Sergeant
Motard's testimony to be credible. 

 At trial, Sergeant Motard testified that he had received information on the day
of the Davis killing that a black Nissan Sentra had pulled up and picked up the two
men seen running from the carwash and had left the area. In other words, he testified
that he knew on May 26 that someone other than the two black males seen running
from the carwash had been driving the black Nissan Sentra that picked them up. 
Sergeant Motard also testified at the suppression hearing that the police were seeking
appellant on June 23 only to ask her about Fields and about her car. But he also
testified at that hearing that the police who were seeking her were part of the HPD
Gang Murder Unit headed by Detective Brown, which had been gathering
information about the Aparece/Ngo missing persons' case. All witnesses in
appellant's suppression hearing and trial agreed that appellant's car was seized and
towed from her workplace without a warrant and without any reason being given, but
with her consent. Appellant testified at the suppression hearing that the officers told
her to sign a consent form to search her car because "it was for them to bring it
downtown because I wasn't allowed to drive it myself." The evidence is undisputed
that appellant was transported to police headquarters in a locked and secured patrol
car, was not told she could leave, and could not have left without asking and being
let out by the police who had towed her car. Appellant testified that her cell phone
was taken from her, and her mother testified that she tried to call appellant on her cell
phone but could not reach her. The trial court found that appellant's testimony at the
hearing was not credible, and it found that Sergeant Motard's testimony at the
suppression hearing that her cell phone and keys were not taken from her and that she
could have left the police car was credible.

 Appellant did not testify at trial. However, Officer Arnold testified at both the
suppression hearing and at trial. At trial, he testified that the officers took appellant's
keys so the car could be towed by a city wrecker so it could be searched by the HPD
crime scene investigators. He also testified that when appellant agreed to be
interviewed "we needed to get her to the officer" expeditiously, so he called a police
car to transport her. And Sergeant Motard testified that when appellant was brought
in for questioning on June 23 he did not know whether she had her cell phone, but he
did not tell her she could use the telephone.

 The evidence at appellant's trial further showed that appellant was taken
directly from her work to police headquarters to give her statement to a uniformed
police officer in an interview room down the hall from where the other suspects in the
Aparece/Ngo disappearance and murder cases and in the Davis murder case were
being held in custody and interrogated for these crimes, with the results of their
warned interrogations and appellant's unwarned interrogation being systematically
checked against each other throughout the evening.

 Sergeant Motard testified at appellant's trial that, prior to taking her first
written statement (regarding the Aparece/Ngo murders) at 7:05 p.m., he would leave
appellant for periods of time to see whether "her version of events comported with
the version of events that the other guys were [telling]," and that "I felt that she could
be criminally culpable." He also testified that he did not tell appellant she could
leave. Rather, after appellant signed the first statement he told her, "Let me just
check with these other guys and see how this whole thing is--you know, what your
information is versus what they're remembering." He then left the workstation, met
with Detective Brown and the team investigating the Davis killing and the Aparace
and Ngo killings, told them her statement "sounded pretty good," and compared notes
on what the other investigators were learning from their interviews with the suspects
in custody. (6) According to Sergeant Motard's trial testimony, Detective Brown
suspected appellant might "have information on" the Davis case and asked Motard
to continue questioning her to try to get information on that case. Sergeant Motard
testified at the suppression hearing that he and appellant discussed the Davis killing
before he took the second written statement. He testified at trial that he did not get
"specific information" indicating appellant was the driver on the Davis case until she
told him "while we were working on the second statement." Although he thought she
was "possibly culpable" at this point, he did not read her her Miranda rights.

 Detective Brown testified at appellant's trial that the HPD team investigating
the Davis murder did not have any leads at first. Appellant's statement, taken by
Sergeant Motard on June 23, gave them their first significant lead. After that
statement, he had the names of three people he believed to be involved--appellant,
Fields, and Johnson.

 Appellant's testimony at the suppression hearing regarding the sequence of
events corresponds to Detective Brown's, Sergeant Motard's, and Officer Arnold's
trial testimony. She testified that between the time she signed her first written
statement at 7:05 p.m., and the time she gave her second written statement, Sergeant
Motard would ask her questions, then would leave and come back and ask more
questions. On one occasion he left the room and came back and said someone had
informed him that she was the driver in the Davis case. Appellant also testified at the
suppression hearing that Sergeant Motard was joined by a second officer "just before"
the start of her second written statement at 7:05 and that that officer asked her
whether she was the driver in the Davis murder. At the time she gave her second
statement she did not believe she was under arrest, but she did not believe she was
free to leave. Appellant also testified at the hearing that she was scared during both
statements and believed she had to do what the officers wanted her to do. Sergeant
Motard's testimony at trial confirmed appellant's emotional state after she had given
her second statement as being one in which "[s]he had gotten emotional . . . and was
teared up and that kind of thing."

 According to the undisputed testimony, appellant was never read her Miranda
rights until the recording was started on her third statement. The only warning she
was given prior to that was the warning recited in her second written statement that
a person commits the offense of perjury "if with the intent to deceive and with
knowledge of the statement's meaning, he or she makes a false statement under oath
or swears to the truth of a false statement previously made and the statement is
required or authorized by law to be made under oath." And Sergeant Motard
repeatedly testified at trial that the only reason for taking the recorded oral statement
was to clarify whether the written statement that appellant had given about Davis the
day before was accurate. That recorded oral statement was immediately used to
procure an arrest warrant while appellant was detained at police headquarters, and the
warrant was immediately served upon her as she waited with Sergeant Motard for a
police unit to arrive to take her from police headquarters to jail.

 Following the suppression hearing at which Sergeant Motard, Officer Arnold,
and appellant testified, the trial court found that appellant was not in custody when
she gave her first and second written statements and that, although she was in custody
for the third, recorded statement, the statement met the requirements for admissibility
because appellant had been informed of her rights and knowingly, intelligently, and
voluntarily gave them up. The court also found that the officers did not suspect
appellant in either the Aparace/Ngo case or the Davis case when they questioned her. 
It found that although appellant could not open the doors to the police car in which
she was transported to HPD headquarters, she was informed that she was not
obligated to speak with the officers and could leave at any time. Finally, the trial
court found that appellant's testimony was not credible and that Sergeant Motard's
and Officer Arnold's testimony was credible.

 Sergeant Motard's and Officer Arnold's testimony on the issues of intent and
indicia of custody at trial, however, along with the other evidence recited above,
demonstrates that the testimony was internally inconsistent, and therefore these
findings were clearly erroneous. Thus, I would not defer to the trial court's findings,
but would review the totality of the evidence to determine whether it shows that
appellant was in custody when she gave each of her statements and whether it shows
that the interrogating officers deliberately employed a two-step question first, warn
later interrogation technique to circumvent her Miranda protections, and, thus,
whether her three statements should all have been excluded. See Carter, 309 S.W.3d
at 38.

 Under Dowthitt and the Supreme Court's opinion in Stansbury, a person is in
custody if (1) he is significantly deprived of his freedom of action in some way; (2) a
law enforcement officer tells him he cannot leave; (3) law enforcement officers create
a situation that would lead a reasonable person to believe his freedom had been
restricted in a significant way; and (4) there is probable cause to arrest and law
enforcement officers do not tell the suspect he is free to leave. Dowthitt, 931 S.W.2d
at 255.

 I would conclude that all four of the indicia of custody were satisfied before
appellant gave her first written statement. Specifically, I would conclude that
appellant was significantly deprived of her freedom of action by having her keys taken
and her car towed, being placed in a locked and secured police car that she could not
exit without asking to leave, not being told she could get out of the car, having her cell
phone taken, not being told she could make a telephone call, being taken to police
headquarters to be interviewed at the desk of a member of the HPD Gang Murder Unit
down the hall from suspects in custody for the same crimes, and not being told that she
was free to leave. See Dowthitt, 931 S.W.2d at 255. I would also conclude, on the
basis of the same evidence, that the law enforcement officers had created a situation
that would lead a reasonable person in appellant's situation to believe her freedom had
been restricted in a significant way. See id. 

 Even assuming, however, that the foregoing indicia of police control were not
sufficient to constitute a custodial situation, I would hold that the situation soon
became custodial under both Jones and Dowthitt when, before she gave her first
written statement at police headquarters, appellant orally provided information
indicating that she was present for the murders of Ngo and Aparece. See Jones, 119
S.W.3d at 771-76 (holding appellant was in custody when officers asked him what he
would think if police investigating murders had been told his "good friend" had said
he had "primary responsibility" for two murders); Dowthitt, 931 S.W. 2d at 257
(holding custody began when appellant admitted to his presence during murders). At
that point, the officer conducting the interview, Sergeant Motard, clearly had probable
cause to arrest appellant, but he did not interrupt the interview at that time to read
appellant her Miranda rights, nor did he discontinue the interview. See Jones, 119
S.W.3d at 771-77; Dowthitt, 931 S.W.2d at 257. Nor did he communicate to appellant
his knowledge of probable cause, as he was required to do. See Dowthitt, 931 S.W.2d
at 257. Rather, he reassured her that she was not under arrest. Appellant then
provided a written statement, which included an explicit statement that she had been
told she was not under arrest.

 These circumstances parallel those in Jones, in which the Court of Criminal
Appeals found that the appellant was in custody when he gave his un-Mirandized
statements. See Jones, 119 S.W.3d at 771-72. Specifically, after being confronted
with the statements of his "good friend, Ricky 'Red' Roosa," and told that Roosa had
named him as "primarily responsible" for the murders about which he was being
questioned in jail, the appellant orally admitted his involvement in the two murders. 
Id. at 771. As he confessed and described the details of the offense, the officer
questioning him "wrote down 'verbatim' what appellant said on a statement form,
asking questions and transcribing the answers as they went along." Id. After an
interview lasting about an hour-and-a-half, the officer "got up, sat down next to
appellant, and went over the legal rights that appeared at the top of the written form. 
Then [he] and appellant read the statement together and appellant corrected mistakes,
initialed revisions, and signed the statement at the bottom." Id. at 772.

 Also paralleling this case, the Court of Criminal Appeals observed in Jones that
"the unwarned and warned statements . . . were given during a nearly undifferentiated
single event, taking place in the same room as an uninterrupted and continuous
process." Id. at 775. In that case, "[t]he written . . . statement was literally a
transcription of [the] appellant's unwarned oral statements," and "[the a]ppellant did
not make a second statement after he finally received his Miranda warnings; he simply
signed the written statement that he had dictated to [the officer] before he was
warned." Id. Here, Sergeant Motard testified that appellant's second written
statement, which he took at his workstation in the homicide division at HPD
headquarters at 8:31 on June 23, "almost resembles the taped part," taken at
headquarters shortly after noon the next day. He also testified that, in taking the
Mirandized recorded oral statement, "I'm already working off the second statement. 
All I'm doing really in that second statement on the tape was confirming what she said
in her first, in her typed written statement."

 Taking into account all of the foregoing evidence and the Dowthitt factors, I
would conclude that the trial court clearly erred in finding on the basis of the
testimony of the witnesses at the suppression hearing that the circumstances of
appellant's questioning would not have led a reasonable person to assume that "that
[s]he [wa]s under restraint to the degree associated with an arrest," i.e., in custody,
when appellant gave her first and second written statements. See Carmouche, 10
S.W.3d at 333; Dowthitt, 931 S.W.2d at 255.

 Appellant was not given the warnings to which she was entitled under the Fifth
Amendment to the United States Constitution and article 38.22, section 2(a) of the
Code of Criminal Procedure, once her interrogation became custodial. See Miranda,
385 U.S. at 418, 86 S. Ct. at 1630; Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a)-(b).
Nevertheless, her interrogation continued without interruption until all the information
necessary to indict her for capital murder had been obtained by law enforcement
officials, checked for accuracy and completeness against information being
concurrently obtained from other suspects in custodial interrogations, written down
by the officer, and signed by appellant. The warnings were administered, instead, just
before she gave her recorded oral statement on June 24, which was expressly solicited
solely to correct discrepancies and to confirm facts previously solicited from her in her
unwarned interrogations. Cf. Jones, 119 S.W.3d at 771-72.

 I conclude that the officers took appellant into custody and interrogated her
while deliberately withholding Miranda warnings as part of a two-step "question
first/warn later" interrogation plan. See Carter, 309 S.W.3d at 38-40. Because no
Miranda warnings were given before either statement was taken, I would hold that
appellant's first and second written statements were taken in violation of both the Fifth
Amendment to the United States Constitution and article 38.22, section 2(a) and (b)
of the Code of Criminal Procedure and were inadmissible into evidence against her. 

 Accordingly, I would sustain appellant's first and second issues.

 C. Appellant's Recorded Oral Statement

 In her third issue, appellant argues that the police deliberately withheld Miranda
warnings prior to her first two statements and then attempted to cure this with a
Miranda warning prior to her third statement. Appellant argues that, in so doing, the
officers intentionally circumvented her constitutional rights against unreasonable
search and seizure and self-incrimination under the Fourth and Fifth Amendments. 
Appellant contends that the Miranda warnings administered before her third statement
were "mid-stream Miranda" warnings and were therefore ineffective because the third
statement was a mere continuation of her first two statements.

 The failure to give timely Miranda warnings generally results in the State's
being required to forfeit the use of any statement obtained during that interrogation,
including a Mirandized statement. Martinez, 272 S.W.3d at 619 n. 10 (Tex. Crim.
App. 2008) (citing Miranda, 384 U.S. at 444, 86 S. Ct. at 1612). When a defendant
claims that his protections under Miranda were thwarted, the burden of showing
admissibility of the statements rests on the State. Id. (citing Seibert, 542 U.S. at 609
n.1, 124 S. Ct. at 2608 n.1). 

 In Martinez, the Texas Court of Criminal Appeals analyzed the United States
Supreme Court's four-judge plurality opinion in Missouri v. Seibert and the
concurrence by Justice Kennedy. In Seibert, as in Martinez, the appellant had
challenged the admissibility of her Mirandized confession as the product of a
question-first-Mirandize-after strategy. The Court of Criminal Appeals quoted the
Supreme Court's plurality opinion, which stated:

 [W]hen a confession so obtained is offered and challenged, attention must be
paid to the conflicting objects of Miranda and the question-first strategy. 
Miranda addressed "interrogation practices . . . likely . . . to disable [an
individual] from making a free and rational choice" about speaking, 384 U.S.
at 464-465, 86 S. Ct. 1602, and held that a suspect must be "adequately and
effectively" advised of the choice the Constitution guarantees. Id. at 467, 86 S.
Ct. 1602. Question-first's object, however, is to render Miranda warnings
ineffective by waiting to give them until after the suspect has already confessed.
. . . By any objective measure, it is likely that warnings withheld until after
interrogation and confession will be ineffective in preparing a suspect for
successive interrogation, close in time and similar in content. The manifest
purpose of question-first is to get a confession that the suspect would not make
if he understood his rights at the outset. When the warnings are inserted in the
midst of coordinated and continuing interrogation, they are likely to mislead
and "deprive a defendant of knowledge essential to his ability to understand the
nature of his rights and the consequences of abandoning them." Moran v.
Burbine, 475 U.S. 412, 424, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986).


Martinez, 272 S.W.3d at 619-20 (quoting Seibert, 542 U.S. at 601, 124 S. Ct. at
2603).

 The Court of Criminal Appeals then quoted, and adopted, the Seibert plurality's
multi-factor test for determining "'whether Miranda warnings delivered midstream'
could be effective," requiring reviewing courts to consider "[1] the completeness and
detail of the questions and answers in the first round of interrogation, [2] the over-lapping content of the two statements, [3] the timing and setting of the first and the
second, [4] the continuity of police personnel, and [5] the degree to which the
interrogator's questions treated the second round as continuous with the first." 
Martinez, 272 S.W.3d at 620 (quoting Seibert, 542 U.S. at 615, 124 S. Ct. at 2612). 

 The Court of Criminal Appeals noted Justice Kennedy's observation in Seibert
that the prior controlling Supreme Court case, "Oregon v. Elstad, 470 U.S. 298, 105
S. Ct. 1285, 84 L. Ed. 2d 222 (1985), should be followed unless there is proof that the
interrogating officer knowingly and willingly utilized the two-stage technique, thus
undermining Miranda warnings." Martinez, 272 S.W.3d at 620 (citing Seibert, 542
U.S. at 619, 124 S. Ct. at 2614 (Kennedy, J., concurring)). Under the Elstad standard,
although an unwarned custodial pre-Miranda-warning statement is inadmissible,
subsequent warned statements may be introduced against the accused when, "given
the facts of the case, 'neither the general goal of deterring improper police conduct nor
the Fifth Amendment goal of assuring trustworthy evidence would be served by
suppression.'" Id. at 621 (quoting Elstad, 470 U.S. at 308, 105 S. Ct. at 1285); see
also Carter, 309 S.W.3d at 41 (finding unwarned pre-Miranda questioning
inadmissible but not part of deliberate two-step plan to undermine Miranda rights, but
finding it "still necessary to determine if appellant's post-warning statements were
voluntarily made."). 

 When a deliberate two-step strategy is used, Justice Kennedy would have held
in Seibert that, "'postwarning statements that are related to the substance of
prewarning statements must be excluded unless curative measures are taken before the
postwarning statement is made.'" Martinez, 272 S.W.3d at 626 (citing Seibert, 542
U.S. at 622, 124 S. Ct. at 2614 (Kennedy, J., concurring)). The Texas Court of
Criminal Appeals agreed with and adopted this standard in Martinez. Id. The Court
also adopted Justice Kennedy's conclusion that "'curative measures . . . designed to
ensure that a reasonable person in the suspect's situation would understand the import
and effect of the Miranda warning and of the Miranda waiver'" could render
statements taken without giving Miranda warnings admissible. Id. (quoting Seibert,
542 U.S. at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring)). 

 The Court of Criminal Appeals gave examples in Martinez of appropriate
curative measures gleaned from both the Seibert plurality opinion and Justice
Kennedy's concurrence: (1) a substantial break in time and circumstances between the
unwarned statement and the Miranda warning; (2) the interrogating officers'
explaining to the defendant the unwarned custodial statements are likely not
admissible; (3) the officers' informing the suspect that although he previously gave
incriminating information he is not obligated to repeat it; (4) the officers' refraining
from referring to the unwarned statement unless the defendant refers to it first; and (5)
the officers' telling a defendant who does refer to his pre-Miranda statement that he
is not obligated to discuss the content of the first statement. Id. at 626-27.

 In Martinez, the Court of Criminal Appeals held that the appellant's rights were
violated, that no curative steps were taken, and that his statement taken without
Miranda warnings was inadmissible under the foregoing standard. See id. at 622-23,
627 (holding statement inadmissible where defendant was not given Miranda
warnings at time of arrest; officers questioned him about crime at police station
without giving required warnings; appellant was taken for polygraph examination
without being given Miranda warnings; and magistrate read Miranda warnings to
appellant only after both first round of interrogation and polygraph examination). The
court stated, "Based on these facts, we have determined that 'the two-step
interrogation technique was used in a calculated way to undermine the Miranda
warning. . . .'" Id. at 623; see also Jones, 119 S.W.3d at 775, 783 (holding second,
warned statement that repeated first unwarned statement inadmissible because waiver
of rights given in connection with second statement was not constitutionally valid in
light of circumstances and entire course of police conduct, but finding error in
admission harmless beyond reasonable doubt).

 Here, appellant's interrogation satisfied each of the Seibert plurality's factors
for determining that a subsequent statement is inadmissible due to a prior statement
given without Miranda warnings. With respect to the first and second factors, after
first assuring themselves during oral questioning of appellant of the answers appellant
would give to both the Aparece/Ngo murders and the Davis murder, the police took
two written statements. In the first statement, appellant criminally implicated herself
in the Aparece/Ngo murders by giving a detailed description of the events in which
she participated before, during, and after the murders. In the second statement,
appellant similarly criminally implicated herself in the Davis murder, providing
sufficient information to the officers to sustain an indictment for capital murder. 
Before either written statement was taken, between the first and second statements,
and during both written statements, the interrogating officer, Sergeant Motard,
repeatedly checked the information appellant gave against information being
concurrently obtained in the interrogation of the male suspects in custody and
admittedly supplied information he had learned from the other interrogations to
appellant and asked her to confirm it. 

 In addition, in taking her oral recorded statement after administering Miranda
warnings, Sergeant Motard confronted appellant with inconsistencies between that
statement and her second written statement to assure the completeness and detail of
her statements in the first and second rounds of interrogation. See Martinez, 272
S.W.3d at 620; see also Seibert, 542 U.S. at 615-16, 124 S. Ct. at 2614. He then
testified that the purpose of the oral recorded statement was to confirm the information
in the second statement. Not only was the content of the statement for which appellant
received Miranda warnings "over-lapping," it was intended to be identical, and the
content of the subsequent statement was repeatedly checked against the content of the
prior statement during the recorded interview. See Martinez, 272 S.W.3d at 620; see
also Seibert, 542 U.S. at 615-16, 124 S. Ct. at 2614.

 With respect to the third and fourth factors, there was no difference in the
setting of the three statements, the time was continuous except for the time appellant
was allowed to sleep at home, and there was complete continuity of police personnel. 
See Martinez, 272 S.W.3d at 620, 626-27; see also Seibert, 542 U.S. at 615-16, 124
S. Ct. at 2614. Viewing all of the evidence, I would conclude that the first written
statement was taken at Sergeant Motard's desk at police headquarters after appellant
had been deprived of her car, her keys, and her cell phone. The second was taken by
Sergeant Motard as soon as her statements from the first written statement were
compared with statements being obtained from the male suspects in custody down the
hall, appellant had been asked if she was the driver in the Davis case, and appellant
had discussed with Sergeant Motard what she would tell him; the third, recorded,
statement followed the next day in the same place with the same officer after appellant
had been given time to sleep at home. 

 Finally, the interrogator's questions treated the second round of questioning on
June 23 as entirely continuous with the immediately preceding first round, and the
interrogator's questions treated the third round on June 24 as continuous with both the
first and second round, and as merely confirming information supplied by appellant
and recorded in her unwarned second written statement the previous day. See
Martinez, 272 S.W.3d at 620; see also Seibert, 542 U.S. at 615-16, 124 S. Ct. at 2614.

 I would conclude that, by any objective measure, the process used to obtain
appellant's statements satisfies the knowing and intentional "two-step" process of
"question first, warn later" held to be an unconstitutional violation of Fifth
Amendment rights in Seibert and Martinez. See Martinez, 272 S.W.3d at 619-26
(setting out law and applying standard to facts of case); see also Seibert, 542 U.S. at
615-16, 620-22, 124 S. Ct. at 2614-16 (same)). 

 None of the steps set out in Martinez to cure violations of Miranda were used
in this case to cure the repeated unconstitutional violations of appellant's rights. See
272 S.W.3d at 626-27. First, there was no substantial break in time and circumstances
between the two unwarned statements and the Miranda warning immediately
preceding the third, warned statement. See id. at 627. Second, the officers did not
explain to appellant that her two unwarned written statements were likely not to be
admissible before warning her and taking her third, recorded oral statement. See id. 
Third, appellant was not informed that, although she had previously given
incriminating information, she was not obligated to repeat it. See id. Fourth, the
interrogating officer did not refrain from referring to the unwarned statements unless
appellant referred to them first. See id. Fifth, the officers did not tell appellant when
she did refer to her pre-Miranda statements that she was not obligated to discuss the
content of her first or second statement. See id.

 Instead, the officers' conduct was exactly the opposite of each of the curative
steps required. Appellant was expressly informed that her answers were being
checked against her earlier statement and those of the male suspects for accuracy and
completeness. She was told she could not leave police headquarters until her answers
were checked against theirs. She was asked to give a second unwarned statement for
the express purpose of providing information about the Davis case after she had
criminally implicated herself in the Aparece/Ngo case and after the record indicates
she had been asked whether she was the driver in the Davis case, a criminal act. And
she was required to acknowledge in her first written statement that she had been
informed that, under section 37.02 of the Texas Penal Code, a person commits the
offense of perjury "if with the intent to deceive and with knowledge of the statement's
meaning, he or she makes a false statement under oath or swears to the truth of a false
statement previously made and the statement is required or authorized by law to be
made under oath." I would conclude that these factors clearly indicate that appellant
was in custody when she gave her first and second written statements and that the
interrogating officers intended to use her sworn statements in evidence against her and
intended to warn her of possible perjury charges if her statements were false. 

 I would hold that no curative steps were taken and that appellant's recorded
statement was inadmissible as the product of an intentional, knowing, and uncured
two-step question first/warn later interrogation technique that violated the Fifth
Amendment to the United States Constitution and article 38.22 of the Texas Code of
Criminal Procedure.

 I would sustain appellant's third issue. Therefore, I would turn to whether the
admission of appellant's redacted first unwarned written statement, her entire second
unwarned written statement, and her third oral recorded statement was harmful.

 D. Harm Analysis

 The admission into evidence of a statement taken in violation of Miranda rights
is constitutional error subject to harmless error review under Texas Rule of Appellate
Procedure 44.2(a). See Tex. R. App. P. 44.2(a); Jones, 119 S.W.3d at 777. In such a
case, reversal is required unless we determine beyond a reasonable doubt that the
failure to suppress the statement did not contribute to the jury's verdict. Tex. R. App.
P. 44.2(a); Jones, 119 S.W.3d at 777. If there is a reasonable likelihood the error
materially affected the jurors' deliberations, the error is not harmless. Jones, 119
S.W.3d at 777. In conducting this analysis, we are required to "calculate, as nearly
as possible, the probable impact of the error on the jury in light of the other evidence." 
Id. 

 In the context of a Miranda violation, we must "'judge the magnitude of the
error in light of the evidence as a whole to determine the degree of prejudice to the
defendant resulting from the error.'" Id. (quoting United States v. Polanco, 93 F.3d
555, 562-63 (9th Cir. 1996) (analyzing Miranda-Elstad error)). Therefore, we must
assess the weight a juror would likely place upon the improperly admitted statements. 
Jones, 119 S.W.3d at 778. To conduct this inquiry in this case, we must assess the
independent proof of appellant's participation in the crime. See Jones, 119 S.W.3d at
778. However, we must be mindful that "[a] defendant's statement, especially a
statement implicating her in the commission of the charged offense, is unlike any other
evidence that can be admitted against the defendant." McCarthy v. State, 65 S.W.3d
47, 55-56 (Tex. Crim. App. 2001); see also Arizona v. Fulminante, 499 U.S. 279, 296,
111 S. Ct. 1246, 1257 (1991). As the Court of Criminal Appeals observed in
McCarthy, "A confession is likely to leave an indelible impact on a jury." 65 S.W.3d
at 56. Indeed, the court noted,

 [A] defendant's own confession is probably the most probative and
damaging evidence that can be admitted against him. . . . [T]he
admissions of a defendant come from the actor himself, the most
knowledgeable and unimpeachable source of information about his past
conduct. Certainly confessions have profound impact on the jury, so
much so that we may justifiably doubt its ability to put them out of mind
even if told to do so.


Id. (quoting Fulminante, 499 U.S. at 296, 111 S. Ct. at 1257).


 Appellant was indicted, tried, and convicted of capital murder. A person
commits capital murder if he intentionally or knowingly causes the death of an
individual in the course of committing or attempting to commit robbery. Tex. Penal
Code Ann. § 19.02(b)(1) (Vernon 2003), § 19.03(a)(2) (Vernon Supp. 2009). A
person commits the offense of robbery if, "in the course of committing theft . . . he
intentionally, knowingly, or recklessly causes bodily injury to another" or
"intentionally or knowingly threatens or places another in fear of imminent bodily
injury or death." Id. § 29.02(a)(1)-(2) (Vernon 2003). A person commits the offense
of aggravated robbery if, in the course of committing a robbery, he uses or exhibits a
deadly weapon. Id. § 29.03(a)(2) (Vernon 2003). While mere presence at the scene
of an offense does not make one a party to the offense, flight from the scene is
circumstantial evidence of guilt. See Eguia v. State, 288 S.W.3d 1, 6-7 (Tex.
App.--Houston [1st Dist.] 2008, no pet.) (citing Harris v. State, 645 S.W.2d 447, 457
(Tex. Crim. App. 1983)).

 The jury charge allowed appellant to be found guilty of capital murder either as
a principal, a party, or a participant in a conspiracy that resulted in the death of Brady
Davis. Specifically, the jury charge allowed the jury to find appellant guilty of capital
murder if the evidence proved, beyond a reasonable doubt, (1) "that on the occasion
in question [appellant] was in the course of committing or attempting to commit the
felony offense of robbery of Brady Davis . . . but also that [appellant] specifically
intended to cause the death of Brady Davis, by shooting with a deadly weapon"; or
(2) "that [appellant] with the intent to promote or assist in the commission of the
offense of robbery . . . solicited, encouraged, directed, aided, or attempted to aid
Dexter Johnson and/or Keithron Fields in shooting Brady Davis, if she did, with the
intention of thereby killing Brady Davis"; or (3) that appellant "entered into an
agreement with Dexter Johnson and/or Keithron Fields to commit the felony offense
of robbery of Brady Davis . . . and pursuant to that agreement they did carry out their
conspiracy, and while in the course of committing said conspiracy, Dexter Johnson
and/or Keithron Fields intentionally caused the death of Brady Davis by shooting with
a deadly weapon, namely a firearm." The jury found appellant guilty of capital murder
without specifying its grounds.

 Virtually no evidence was admitted at trial that placed appellant at the scene of
the Davis murder other than her three illegally obtained confessions. Moreover, even
if there had been more evidence against appellant than there was, under the
circumstances of this case--in which three improperly admitted statements provided
all the details necessary to convict appellant of capital murder--I would still agree
with the Court of Criminal Appeals' statement in McCarthy, that, "[r]egardless of
whether there was, apart from appellant's statement, sufficient evidence to conclude
that the outcome of the trial was proper, we find it impossible to say there is no
reasonable likelihood that the State's use of appellant's statement[s] materially
affected the jury's deliberations." 65 S.W.3d at 56.

 I conclude it cannot be determined beyond a reasonable doubt that appellant's
confession did not contribute to her conviction, and therefore I would hold that
reversal is required. See Tex. R. App. P. 44.2(a). (7)




CONCLUSION

 I would reverse the judgment of the trial court and remand the cause for a new
trial.




 Evelyn V. Keyes

 Justice


Panel consists of Justices Keyes, Alcala, and Hanks.

Justice Keyes, dissenting.

Publish. Tex. R. App. P. 47.2(b).
1. See Tex. Penal Code Ann. § 19.03 (Vernon Supp. 2009).
2. See Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 1630 (1966).
3. The Aparece/Ngo investigation resulted in the arrest, trial, and capital murder
convictions of Johnson and Fields. See Johnson v. State, No. AP-75749, 2010 WL
359018 (Tex. Crim. App. Jan. 27, 2010), cert. denied, 2010 WL 1725690 (June 28,
2010) (not designated for publication) (affirming capital murder conviction of Dexter
Darnell Johnson in deaths of Aparece and Ngo); Fields v. State, No. 01-07-00856-CR,
2009 WL 723992 (Tex. App.--Houston [1st Dist.] March 19, 2009, pet. ref'd) (not
designated for publication) (affirming capital murder conviction of Keithron Marquis
Fields in deaths of Aparece and Ngo).
4. According to the Johnson opinion affirming Johnson's capital murder
conviction in the deaths of Aparece and Ngo, Johnson was arrested for marijuana
possession on June 21 by the Humble Police Department (Humble P.D.) following
Fields' mother's report of unknown vehicles in the parking lot of her apartment
complex--one of which turned out to be Aparece's. Johnson, 2010 WL 359018, at
*1-2. Based on information obtained by the Humble P.D. and by the Fort Bend
Sheriff's Department, which was investigating the Aparece/Ngo missing persons
report, Johnson was charged with aggravated robbery on June 22 and transferred to
the Harris County Jail. Id. at *2-3. Around 8:00 p.m., he was transported from the
Harris County Jail to the HPD's homicide division, where Officer Abbondondalo read
him his rights and then questioned him using a tape recorder. Id. Also on June 23,
according to the Johnson opinion, Detective A. Brown of HPD's homicide division
helped execute an arrest warrant for Timothy Randle. Id. at *3. Detective Brown
transported Randle to the HPD homicide division and questioned him. Id. Twenty
minutes into his questioning of Randle at HPD headquarters, Brown suspended the
interrogation so that Randle could show him the location of Aparece's and Ngo's
bodies. Id. HPD Officer Abbondondalo accompanied them to the crime scene. Id. 
After locating the bodies, they returned to the homicide division, where Brown
resumed questioning Randle. Id. "Around that time, the Ervins[, appellant and her
brother Louis,] were also arrested and questioned at the homicide division." Id.

 According to the Fields opinion, HPD also obtained a warrant for Fields' arrest
on June 23 based on the statements given by Johnson and the evidence obtained by
the Humble P.D. homicide investigators, and Fields was arrested that same day. 
Fields, 2009 WL 723992, at *2.
5. Article 38.22, section 2 provides:


[N]o written statement made by an accused as a result of custodial
interrogation is admissible as evidence against him in any criminal proceeding
unless it is shown on the face of the statement that:


 (a) the accused, prior to making the statement, either received from a
magistrate the warning provided in Article 15.17 of this code or
received from the person to whom the statement is made a warning that:


 (1) he has the right to remain silent and not make any statement
at all and that any statement he makes may be used against him
at this trial;


 (2) any statement he makes may be used as evidence against him
in court;


 (3) he has the right to have a lawyer present to advise him prior
to and during any questioning;


 (4) if he is unable to employ a lawyer, he has the right to have a
lawyer appointed to advise him prior to and during any
questioning; and 


 (5) he has the right to terminate the interview at any time; and


 (b) the accused, prior to and during the making of the statement,
knowingly, intelligently, and voluntarily waived the rights set out in the
warning. . . .


Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a)-(b) (Vernon 2005).
6. This testimony is corroborated by the time lines in the Johnson and Fields opinions. 
See Johnson, 2010 WL 359018, at *2-*3; Fields, 2009 WL 723992, at *2.
7. Because the foregoing matters are dispositive of this case, I would not reach
appellant's fourth through seventh issues, arguing legal and factual sufficiency of the
evidence to support appellant's conviction.